UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEJUAN SMITH and,
MONIQUE MAYS,

    Plaintiffs,                                         Civil Action No. 16-CV-13881

vs.                                                  HON. BERNARD A. FRIEDMAN

CITY OF HAMTRAMCK,
M. MATCHETT, and
RYAN YOUNG,

    Defendants.
_____/

## **OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is presently before the Court on defendants' motion for summary judgment [docket entry 33]. Plaintiffs have filed a response in opposition, and defendants have filed a reply. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide the motion without a hearing.

*Background*

This is a police misconduct case. On July 30, 2015, Monique Mays and her boyfriend, Dejuan Smith, were driving along Carpenter Street in Hamtramck, Michigan when they were pulled over by City of Hamtramck Police Officer Matthew Matchett for running a stop sign, although Mays was certain she had come to a complete stop. Mays Compl. ¶ 10; Smith Compl. ¶

10[1]; Mays Dep. at 52-55; Smith Dep. at 40-41; Matchett Dep. at 29, 62-63. Matchett recalls that Mays was "not happy" about being pulled over. Matchett Dep. at 64.

When Matchett approached her car, Mays handed him her driver's license, registration, and proof of insurance. Mays Dep. at 53-54; Smith Dep. at 42; Matchett Dep. at 64. Matchett reviewed Mays' documents and discovered that her car was not insured. Matchett Dep. at 64-65. As a result, he informed plaintiffs that he was going to impound the car and that it would have to be towed. Mays Compl. ¶ 12; Mays Dep. at 55-56; Smith Dep. at 44-45; Matchett Dep. at 71.

Matchett instructed plaintiffs to get out of the car. Mays Dep. at 56; Smith Dep. at 45; Matchett Dep. at 71. Plaintiffs assert that they complied. Mays Dep. at 56; Smith Dep. at 45, 66. However, Matchett and Matthew Wood, one of the back-up officers who arrived at the scene, assert that Mays refused to get out. Matchett Dep. at 51; Wood Dep. at 19. According to Matchett, Mays refused his commands to step out of the car three times, and she told him that he would have to pull her out of the car. Matchett Dep. at 51, 79; Wood Dep. at 19. He states that Mays only exited the car when he advised her that she was under arrest or that she would be under arrest for obstruction if she did not get out of the car. Matchett Dep. at 52.

Matchett states that after Mays got out of the car, he gave her various orders, such as to stop walking, to not get anything out of her car, and to go to the front of his police car. *Id.* at 56, 58-59, 80; Wood Dep. at 20, 29. Mays says she complied with Matchett's orders, Mays Compl. ¶¶ 13-14; Mays Dep. at 56, whereas Matchett and Wood say she did not. Matchett Dep. at 59; Wood Dep. at 20. Matchett also asked Mays to give him her purse. Mays Compl. ¶ 14; Mays Dep. at 56-57; Smith Dep. at 46; Matchett Dep. at 61; Wood Dep. at 27-28. While Mays contends

---

[1] On July 27, 2017, plaintiffs' cases were consolidated [docket entry 24].

that she dropped it on the ground, Mays Compl. ¶ 14; Mays Dep. at 57-58, 62; Smith Dep. at 46-47, 66, Matchett and Wood claim that Mays threw her purse at Matchett and that it hit him in the leg. Matchett Dep. at 60; Wood Dep. at 25, 28-29.

When Mays released her purse, Matchett pulled out his taser, pointed it at her, and told her that she was under arrest and to put her hands behind her back. Mays Compl. ¶ 15; Mays Dep. at 57-60, 62-64; Smith Dep. at 50; Matchett Dep. at 61-62, 79; Wood Dep. at 29. Matchett and Wood assert that Matchett "never stopped" giving Mays these orders and that he told her this "continuously" and "over and over again." Matchett Dep. at 61-62, 79; Wood. Dep. at 29. Matchett estimates that he gave Mays these orders "approximately seven times." Matchett Dep. at 43.

Mays claims that upon hearing that she was under arrest, she stopped walking. Mays Dep. at 57, 62, 85. She states that she complied with Matchett's orders to put her hands behind her back. Mays Compl. ¶ 15; Mays Dep. at 62. Yet Matchett testified that Mays kept walking away from him although he repeatedly told her to stop. Matchett Dep. at 39. Wood also testified that Mays refused to comply with Matchett's orders. Wood Dep. at 29-32, 34. Wood contends that Mays was screaming and "was extremely volatile, throwing her hands around, refusing to cooperate, [and] refusing to put her hands behind her back." *Id.* at 29, 31, 35.

Mays states that when Matchett had his taser out she turned around to face him and asked him why it was pointed at her. Mays Dep. at 63, 65; Smith Dep. at 52, 57. Plaintiffs state he said nothing in response. Mays Dep. at 64-65; Smith Dep. at 52. Smith's video recording of this event shows Mays putting her hands up and telling Matchett and other back-up officers that she had nothing on her. Mays Dep. at 63-65; Smith Dep. at 52, 57; Pls.' Resp. Ex. C at 0:00-0:07. To demonstrate that this was true, Mays pulled up her shirt and unbuttoned her pants. Mays

Compl. ¶ 17; Mays Dep. at 63; Smith Dep. at 50; Pls.' Resp. Ex. C at 0:03-0:07. As Mays held up her shirt, Matchett tased her bare abdomen. Mays Compl. ¶ 18; Mays Dep. at 63; Smith Dep. at 50; Matchett Dep. at 40-41; Pls.' Resp. Ex. C at 0:06-0:07. Matchett and Ryan Young, another back-up officer, indicate that Mays had taken an aggressive or fighting stance, but the video does not show this to be the case. Matchett Dep. at 40-42; Woods Dep. at 32-34; Pls.' Resp. Ex. C at 0:00-0:07.

Mays says that when the taser hit her, she fell back and blacked out. Mays Compl. ¶ 18; Mays Dep. at 63; Smith Dep. at 55. She recalls being kneed in the back when she was lying on the ground and Young was handcuffing her. Mays Compl. ¶ 19; Mays Dep. at 63-64, 66-67; Smith Dep. at 55-56, 67; Matchett Dep. at 18, 44. Young asserts that his knee was placed on Mays' side and not her back. Young Dep. at 31-33. Young states that Mays did not complain that his knee was hurting her. *Id.* at 30.

Matchett testified that Mays was incapacitated after being tased, was not actively resisting, and did not try to get up. Matchett Dep. at 20. But Young testified that Mays was not incapacitated from the taser. Young Dep. at 30, 40. He did not recall whether Mays struggled with him or resisted arrest when she was on the ground. *Id.* at 31-32. He did recall, however, that Mays was "wiggling" on the ground or moving from side-to-side. *Id.* at 40-42. He claims he placed his knee on her because he was concerned she might try to resist arrest. *Id.* at 30-31, 42. The video does not provide a clear picture of Mays' movements when she was on the ground. Pls.' Resp. Ex. C at 0:11-1:00. Once handcuffed, Mays was pulled up from the ground and taken to a police car. Mays Dep. at 67; Smith Dep. at 56-57; Young Dep. at 31; Pls.' Resp. Ex. C at 1:33-1:40.

Matchett states that when Mays was tased, Smith began yelling and screaming and was "disorderly, [and] distracting" Matchett. Matchett Dep. at 45, 70. The officers told Smith several times to leave, and Matchett states that Smith refused to comply. *Id.* at 70; Young Dep. at 21; *see* Pls.' Resp. Ex. C at 0:44-1:20, 2:19-2:22, 2:25-2:27, 2:38-2:40. When Mays was getting into the police car, Smith yelled out to her asking her for her phone so he could call her family, but he says that when no one responded, he walked away from the scene and towards his house. Smith Dep. at 58-62, 68. The video depicts Smith asking Mays for her phone, Pls.' Resp. Ex. C at 1:35-1:45, but ends before Smith started walking away. Also not captured in the video is Matchett's and Young's assertion that when Mays was in the police car, Smith tried to approach the car to talk to her, ignoring Matchett's commands not to do so because Mays was under arrest. Matchett Dep. at 70; Young Dep. at 20.

When Smith was on his way to his house, Matchett approached him and arrested him. Smith Dep. at 59-60, 63, 69-70. Smith says Matchett told him he was under arrest, and he cooperated by turning around and putting his arms behind his back so that Matchett and Young could handcuff him. Smith Compl. ¶ 12; Smith Dep. at 71-72, 89; Matchett Dep. at 46. Meanwhile, Matchett's version of the facts is that when he told Smith he was under arrest for obstruction of justice, Smith continued walking into the street with his hands up and "yelling at the top of his lungs." Matchett Dep. at 70. Matchett testified that he and Young then approached Smith and arrested him. *Id.* According to Matchett, Smith initially refused to comply with the order to put his hands behind his back but eventually complied and the handcuffs were placed on him "without incident." *Id.* at 74-75.

Mays was charged with disobeying a stop sign, having no proof of insurance, and obstruction of justice. Mays Dep. at 77; Matchett Dep. at 47. Smith was charged with obstruction

of justice. Smith Compl. ¶ 12; Defs.' Summ. J. Br. Ex. E; Pls.' Resp. Ex. D. Smith's case was later dismissed without prejudice because Matchett – the officer who brought the charges against him – did not appear at a pre-trial court proceeding. Smith Dep. at 81-82; Matchett Dep. at 47-48; Pls.' Resp. Ex. D.

Plaintiffs filed separate complaints. In Count I of Mays' complaint, she asserts that Matchett and Young violated her Fourth Amendment right to be free from excessive force, Matchett for tasing her and Young for kneeing her.[2] Mays' Compl. ¶¶ 23-29. In Count II, Mays asserts a *Monell* claim against the City of Hamtramck. *Id.* ¶¶ 30-36. In Count I of Smith's complaint, he also asserts a Fourth Amendment excessive force claim against both officers.[3] Smith Compl. ¶¶ 15-21. In Count II, Smith asserts a false arrest and/or imprisonment claim under state law against Matchett and Young. Compl. ¶¶ 22-28. In Count III, Smith asserts a Fourth Amendment claim of unreasonable seizure without probable cause against Matchett and Young. Compl. ¶¶ 29-36. In Count IV, Smith asserts a malicious prosecution claim under state law against Matchett. Compl. ¶¶ 37-42. In Count V, Smith asserts a claim of malicious prosecution in violation of the Fourth Amendment against Matchett. Compl. ¶¶ 43-50. In Count VI, Smith asserts a *Monell* claim against the City of Hamtramck. *Id.* at ¶¶ 51-57.

Defendants now seek summary judgment in their favor on all of plaintiffs' claims.

---

[2] In Count I of Mays' complaint, she references both the Fourth and Fourteenth Amendments. Mays Compl. ¶¶ 25-27. But in plaintiffs' response, she clarifies that her excessive force claim is brought under the Fourth Amendment. Pls.' Resp. at 1 n.1.

[3] Plaintiffs indicate in their response brief that Smith voluntarily dismissed his Fourth Amendment excessive force claim after conducting discovery. Pls.' Resp. Br. at 1 n.1.

6

*Summary Judgment Standard*

Under Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Viewing the evidence in the light most favorable to the opposing party, summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. *See id.* at 248-50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990). "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

*Discussion*

    **A. Mays' Count I – Fourth Amendment Excessive Force Claim**

Mays asserts that Matchett and Young violated her Fourth Amendment right to be free from excessive force. Compl. ¶¶ 23-29. She states that this clearly established right was violated by Matchett when he tased her and by Young when he kneed her in the back. *Id.* ¶ 26. Defendants argue that they are entitled to summary judgment because Mays has failed to demonstrate that they used excessive force. They argue that even viewing the evidence in the light

most favorable to plaintiffs, Mays' Fourth Amendment rights were not violated and the officers only used limited force after she ignored their orders and resisted arrest. Defs.' Summ. J. Br. at 5, 9-10.

"To determine whether officers' use of force in effecting an arrest is excessive and thus in violation of the Fourth Amendment, a court must determine 'whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" *Brown v. Chapman*, 814 F.3d 447, 458 (6th Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). The inquiry assesses "reasonableness at the moment" the force was used, "as judged from the perspective of a reasonable officer on the scene [often forced to make split-second decisions], rather than with the 20/20 vision of hindsight." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quoting *Graham*, 490 U.S. at 396) (alteration added). A court evaluating whether the officer's force was reasonable must balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (quoting *Graham*, 490 U.S. at 396).

The "test of reasonableness under the Fourth Amendment" is fact-specific and involves considering three non-exhaustive factors: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The focus should be not on "the 'extent of the injury inflicted' but whether an officer subjects a detainee to 'gratuitous violence.'" *Miller v. Sanilac Cty.*, 606 F.3d 240, 252 (6th Cir. 2010) (internal quotation omitted).

a. Matchett

In the present case, the first *Graham* factor – the severity of the crime at issue – favors a finding that Matchett's use of a taser was not objectively reasonable. Mays was charged with disobeying a stop sign, having no proof of insurance, and obstruction of justice. These crimes are not severe. Matchett Dep. at 47 (testifying that running through a stop sign and having no proof of insurance are not "arrestable offenses"); *Brown*, 814 F.3d at 458 (holding that driving without headlights on and refusing to provide identification to an officer upon being stopped are both misdemeanors that are not severe enough to warrant the use of a taser); *Lyons v. City of Xenia*, 417 F.3d 565, 587 (6th Cir. 2005) (concluding in its analysis of the first *Graham* factor that the offenses with which the plaintiff was charged – obstructing official business, assault, and resisting arrest – are not severe).

The second *Graham* factor – whether Mays posed an immediate threat to the safety of the officers or others – also weighs against a finding that Matchett's use of a taser was objectively reasonable. In their summary judgment brief, defendants make no mention of having experienced an immediate threat to their safety during their interaction with Mays. Plaintiffs, however, assert that Mays was acting in a "non-threatening manner" and started to undress in order to show Matchett that she had nothing on her. Pls.' Resp. at 17-18; Mays Dep. at 63; Smith Dep. at 50. Indeed, the video clearly shows that immediately before Matchett tased Mays, she had what appears to be a cell phone in her left hand and keys in her right hand. Pls.' Resp. Ex. C at 0:00-0:07. She extended her arms out to both sides and then lifted up her shirt and unbuttoned her shorts. *Id.* That was when Matchett suddenly, and with no apparent justification, shot her with his taser. *Id.* at 00:06-0:07. In the video, the officers are heard saying, "she didn't listen." *Id.* at 0:31-0:38. After Mays was handcuffed, one of the officers (it is unclear which one) indicated that

9

she was tased not because of concerns of an imminent threat, but "because she refused a lawful order by a police officer." *Id.* at 1:55-1:58 ("If you don't listen, that's what happens."), 2:06-2:13. A reasonable jury viewing these facts in a light most favorable to Mays could conclude that Mays did not pose an immediate threat to the safety of the officers or others.

The third *Graham* factor – whether Mays was actively resisting arrest or attempting to evade arrest by flight – also favors a finding that Matchett's use of his taser was not objectively reasonable. Defendants merely argue that Mays "ignored the Officers' repeated directives and resisted." Defs.' Summ. J. Br. at 10. Defendants do not specify what Mays resisted (whether it was arrest or something else), and they present no evidence that Mays tried to flee. Nor does the video show Mays trying to flee. Pls.' Resp. Ex. C at 0:00-0:07. Mays relies on her testimony that she cooperated with Matchett's orders and did not resist arrest. Pls.' Resp. at 18; Mays Dep. at 56-57, 62-65, 85. She contends that when Matchett told her she was under arrest, she stopped walking. Mays Dep. at 57, 64, 85. Based on Mays' testimony and the video recording, a reasonable jury could conclude that Mays was not actively resisting arrest or attempting to flee.

b. Young

As mentioned above, the crimes with which Mays was charged with are not severe. This first *Graham* factor therefore favors a finding that Young's use of force was not objectively reasonable.

Also noted above, a reasonable jury could find that Mays did not pose an immediate threat when Matchett tased her. Mays arguably posed an even lesser threat when Young was handcuffing her. Mays was lying on the ground having just been electroshocked, and nothing in the video shows any kind of threatening movements such as flailing of arms or kicking of legs. Pls.' Resp. Ex. C at 0:11-1:00. Moreover, Matchett testified that she was incapacitated after being

tased, Matchett Dep. at 20, and Mays testified that she blacked out when she was tased. Mays Dep. at 63.

Regarding whether Mays was actively resisting arrest or evading arrest by flight, Young testified that he did not recall Mays resisting arrest when she was on the ground and he was handcuffing her. Young Dep. at 31-31. But he testified that Mays was not incapacitated and that she was "wiggling" or moving from left to right. *Id.* at 40-42. He indicated that given Mays' movements, he put his knee on her because he was "worried that she was going to resist [his] efforts as she was moving side-to-side." *Id.* at 42. However, Matchett testified that Mays was incapacitated after being tased, was not actively resisting, and did not try to get off the ground. Matchett Dep. at 20. The video recording does not clearly show what Mays' movements were, if any, when she was on the ground being handcuffed. Pls.' Resp. Ex. C at 0:11-1:00. As the evidence on this point is unclear, the jury will have to determine whether Mays was resisting arrest such that Young was justified in kneeing her while handcuffing her.

In their summary judgment brief, defendants cite *Bozung v. Rawson*, 439 F. App'x 513 (6th Cir. 2011), presumably to support their argument on the excessive force claim against Young. Defs.' Summ. J. Br. at 9. In *Bozung*, the court determined that it was objectively reasonable for an officer to put his knee on the plaintiff's back when he was handcuffing him because "[t]aking the evidence in light most favorable to [the plaintiff], the kneeing . . . occurred not when [the plaintiff] was neutralized, but while the officers were handcuffing him." 439 F. App'x at 521 (internal citations omitted). In the present case, however, a jury could find that Mays was already "neutralized" when Young was handcuffing her based on Mays' testimony that she had blacked out, Matchett's testimony that Mays was incapacitated and not actively resisting, and the video evidence showing Mays lying on the ground. Whether it was objectively reasonable for

Young to place his knee on her back given these circumstances remains a question of fact for the jury.

Because a reasonable jury viewing the evidence in the light most favorable to Mays could find that Matchett's and Young's use of force was not objectively reasonable, defendants are not entitled to summary judgment on Count I of Mays' complaint.[4]

### B. Smith's Counts II, III, IV, and V – State and Constitutional Claims of False Arrest and/or Imprisonment, Unreasonable Seizure Without Probable Cause, and Malicious Prosecution

In Count II, Smith asserts a state claim of false arrest and/or imprisonment against Matchett and Young. Compl. ¶¶ 22-28. In Count III, he asserts a federal claim of unreasonable seizure without probable cause against both officers. *Id.* ¶¶ 29-36. In Count IV, he asserts a malicious prosecution claim under state law against Matchett. *Id.* ¶¶ 37-42. In Count V, he asserts a malicious prosecution claim under federal law against Mattchett. *Id.* ¶¶ 43-50. Defendants argue that they are entitled to summary judgment on Smith's claims of unreasonable seizure without probable cause under federal law and malicious prosecution under state and federal law because plaintiffs have failed to establish that Smith was arrested without probable cause where there was "ample" probable cause to arrest him, so the record does not contain sufficient evidence of a

---

[4] Defendants also argue that they are entitled to qualified immunity on this claim. Defs.' Summ. J. Brief at 10-13. The Court rejects this argument. Mays' right to be free from *any* force under the circumstances she alleges is clearly established. *Goodwin v. City of Painesville*, 781 F.3d 314, 326 (6th Cir. 2015) (finding "that by mid-2005, '[t]he general consensus among our cases is that officers cannot use force . . . on a detainee who has been subdued . . . or is not resisting arrest'" (quoting *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009))). The issue in the present case is not legal but factual, i.e., whether she posed a threat to the officers and whether she was resisting arrest. When, as in this case, the facts are disputed, the qualified immunity defense cannot be resolved on summary judgment. *Austin v. Redford Twp. Police Dep't*, 859 F. Supp. 2d 883, 889 (E.D. Mich. 2011), *aff'd*, 690 F.3d 490 (6th Cir. 2012) ("Because there is a genuine issue of material fact as to whether the plaintiff posed a threat, granting [the defendant] qualified immunity is inappropriate." (citing *Bouggess v. Mattingly*, 482 F.3d 886, 896 (6th Cir. 2007))).

constitutional violation. Defs.' Summ. J. Br. at 8, 10, 14. Yet defendants remain silent on why they are entitled to summary judgment on Smith's false arrest and/or imprisonment claim under state law.

Claims of false arrest and/or imprisonment, unreasonable seizure without probable cause, and malicious prosecution "[e]ach . . . require [the] Plaintiff to show that there was not probable cause for his arrest." *Parker v. City of Taylor*, No. 15-10113, 2016 WL 454464, at *2 (E.D. Mich. Feb. 5, 2016) (internal citations omitted). In other words, these claims are precluded if a finding is made that probable cause for the plaintiff's arrest existed. *Id.* The same is true under Michigan law. *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. Ct. App. 2003) ("To prevail on a claim of false arrest or false imprisonment, a plaintiff must show that the arrest was not legal, i.e., the arrest was not based on probable cause." (internal citation omitted)); *Matthews v. Blue Cross & Blue Shield of Mich.*, 572 N.W.2d 603, 610 (Mich. 1998) ("[T]he plaintiff's burden in a malicious prosecution case is to make a prima facie showing that the defendant's agents lacked probable cause to believe that the plaintiff had committed a crime.").

"Probable cause to arrest exists if the facts and circumstances within an officer's knowledge warrant a reasonable belief that a person has committed, is committing, or is about to commit a crime," including the violation of a city ordinance. *Neyland v. Molinaro*, 368 F. Supp. 2d 787, 792 (E.D. Mich. 2005) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)). The Court "consider[s] only the information possessed by the arresting officer at the time of the arrest." *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008) (quoting *Harris v. Bornhorst*, 513 F.3d 503, 511 (6th Cir. 2008)). "A finding of probable cause does not require evidence that is completely convincing or even evidence that would be admissible at trial; all that is required is that the evidence be sufficient to lead a reasonable officer to conclude that the arrestee has

committed or is committing a crime." *Id.* Under Mich. Comp. Laws § 764.15(1)(a), a peace officer may make a warrantless arrest if an "ordinance violation is committed in the peace officer's presence."

In the present case, Smith was charged with obstruction of justice under City of Hamtramck Ordinance 130.002(O). Defs.' Summ. J. Br. Ex. E; Pls.' Resp. Ex. D. This ordinance provides that

> [n]o person shall:
>
> (O) Knowingly obstruct or resist any member of the Police force . . . in the discharge of the officer's lawful duties or fail to obey the lawful order of said officer, knowing the officer to be a member of the Police force . . . .

City of Hamtramck Ordinance 130.002(O).[5]

Defendants argue that Smith acted disorderly from the time that Matchett initiated the traffic stop. Defs.' Summ. J. Br. at 7. They contend that after Mays was arrested, Smith's "conduct evolved into obstructive behavior" because he approached the police car in which Mays was detained despite Matchett's several verbal commands that Smith not do so. *Id.* Plaintiffs' response highlights Smith's compliance with Matchett's orders. Pls.' Resp. at 14.

The video evidence establishes that Matchett and Young had probable cause to arrest Smith for obstruction of justice because it shows that Smith "failed to obey the lawful order" of the officers while "knowing [they were] member[s] of the Police force." City of Hamtramck Ordinance 130.002(O). When Matchett tased Mays, Smith was told to "stay back" three times, after which an officer told him that he was "interfering." Pls.' Resp. Ex. C at 0:11-0:18. The

---

[5] *See* City of Hamtramck, Michigan Code of Ordinances, http://library.amlegal.com/nxt/gateway.dll/Michigan/hamtramck_mi/cityofhamtramckmichiganc odeofordinances?f=templates$fn=default.htm$3.0$vid=amlegal:hamtramck_mi (last visited July 30, 2018).

14

officers then told Smith up to seven times to "get back by the car." *Id.* at 0:44-1:20. Yet Smith still did not move from where he was standing. *Id.* The video concludes with the officers again telling Smith three more times to leave. *Id.* at 2:19-2:22, 2:25-2:27, 2:38-2:40.

Smith also appears to continue to defy the police officers' orders in another way. The video shows Smith was insistent on retrieving Mays' phone, even after the officers told him that he could not because the car was being impounded so nothing could be taken out of it and suggested to Smith that he "be on [his] way." *Id.* at 1:35-1:50, 2:29-2:35, 2:38-2:44. That Smith responded by saying "I'm going to get it. Her daddy a [sic] fireman," suggests that Smith intended to continue to disobey the officers' orders. Smith undoubtedly knew that defendants were police officers, as the video begins with Smith referring to the officers as "police," and the officers were all in uniform. *Id.* at 0:00-0:03.

Based on these facts, the Court concludes that Matchett and Young had probable cause to arrest Smith for violating the local ordinance regarding obstruction of justice. Summary judgment is therefore granted to both officers on Smith's Counts II, III, IV, and V.

### C. Mays' Count II and Smith's Count VI – *Monell* Claims

Plaintiffs also assert municipal liability claims against the City of Hamtramck under *Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978), on the grounds that it failed to adequately train its officers on the proper use of force and that it failed to adequately supervise them. Mays Compl. ¶¶ 30-36; Smith Compl. ¶¶ 51-57.

"[A] municipality cannot be held liable under § 1983 simply because one of its employees violated the plaintiff's constitutional rights." *Smith v. City of Troy, Ohio*, 874 F.3d 938, 946 (6th Cir. 2017) (internal citation omitted). "[T]o impose § 1983 liability on a municipality, the plaintiff must prove that the constitutional deprivation occurred as a result of an official custom

or policy of the municipality." *Id.* (internal citation omitted). A city "custom or policy must be the 'moving force' behind the constitutional violation"; the plaintiff must "identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Amerson v. Waterford Twp.*, 562 F. App'x 484, 490 (6th Cir. 2014) (internal quotations omitted).

"A systematic failure to train police officers adequately is a custom or policy which can lead to municipal liability." *Miller*, 606 F.3d at 255 (internal citation omitted). A plaintiff may also prove municipal liability by pointing to a policy of inadequate supervision or to "a custom or practice of tolerating the violation of federal rights by its officers or agents." *Lucier v. City of Ecorse*, No. 12-cv-12110, 2014 WL 1260651, at *25 (E.D. Mich. Mar. 27, 2014) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)). "To succeed on a claim for failure to supervise or train, the plaintiff must prove that: (1) the training or supervision was inadequate for the tasks the officer . . . was performing; (2) the inadequate training resulted from the defendants' deliberate indifference; [and] (3) the inadequacy caused the injury." *Id.* (citing *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). "To establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause an injury." *Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 573 (6th Cir. 2016) (quoting *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)) (alteration in original).

"When attempting to attach liability through a failure to train or supervise theory, it must be shown that the failure was a 'deliberate' or 'conscious' choice by the municipality." *Kammeyer v. City of Sharonville, Ohio*, No. 1:01-CV-00649, 2006 WL 1133241, at *11 (S.D. Ohio

Apr. 27, 2006) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)). "Determining whether deliberate indifference is present in failure to train or supervise cases involves applying an objective rather than subjective standard." *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 841 (1970)).

Defendants argue that summary judgment is appropriate on plaintiffs' *Monell* claims because "[t]he record is devoid of a specific policy or custom that creates a direct causal link to the alleged[] injuries suffered by the Plaintiffs in this matter." Defs.' Summ. J. Br. at 14. In response, plaintiffs ask the Court to infer that the City of Hamtramck did not properly train its officers on how to carry out a lawful arrest and on applying the proper use of force because (1) defendants "do not specifically dispute the absence of training in their brief" and (2) defendants provided plaintiffs with "absolutely no training records" during discovery even though plaintiffs requested them "on more than one occasion." Pls.' Resp. at 22-23. Plaintiffs indicate that the personnel files of Matchett and Young were produced; however, "their files were absent of any training records whatsoever." *Id.* Plaintiffs do not attach copies of these personnel files to their response brief. Plaintiffs rely instead on the report of their expert, W. Ken Kataris, a copy of which they do attach to their response. Pls.' Resp. Ex. E. Kataris opines that had the officers, including Matchett, been properly trained, they would have an understanding of active versus passive resistance and Mays would not have been tased. Pls.' Resp. at 23; Pls.' Resp. Ex. E. at 6-7. Plaintiffs also rely on Kataris' opinion that the Use of Force policy relied on by the City of Hamtramck Police Department was deficient and did not provide proper guidance on the use of force. Pls.' Resp. at 23; Pls.' Resp. Ex. E. at 7.

As to plaintiffs' failure to supervise claims, plaintiffs argue that the lack of training or performance evaluations in the defendant officers' personnel files establishes that the City does

17

not regularly conduct performance evaluations or review or monitor their conduct. Pls.' Resp. at 25. Plaintiffs thus conclude that "[i]t is clear that Defendant City of Hamtramck has routinely failed to review its[] police officers." *Id.* at 25-26.

Plaintiffs' arguments miss the mark. Defendants are entitled to summary judgment on these claims because plaintiffs have not shown deliberate indifference on the part of the City of Hamtramck. Specifically, plaintiffs have provided no evidence of "prior instances of unconstitutional conduct" regarding unlawful arrests and the use of force that "demonstrate[es] that the [City] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause an injury." *Brown*, 844 F.3d at 573. Plaintiffs cite to *McAdam v. Warmuskerken*, No. 1:11-CV-170, 2012 WL 4384198, at *6 (W.D. Mich. Sept. 25, 2012), in support of their argument that a lack of evidence regarding the officers' training permits an inference of inadequate training. But in *McAdam*, evidence was lacking because the data at issue had been destroyed – a fact that was undisputed – and in addition to pointing to the lack of evidence, the plaintiff in that case provided "historical use data" relevant to his *Monell* claim. *Id.* In the present case, the parties have not indicated that the relevant evidence has been destroyed, and plaintiffs have not provided any "historical" information to support their *Monell* claims.

Plaintiffs also rely on *Kammeyer*, 2006 WL 1133241, at *11, to support their failure to supervise argument. Pls.' Resp. at 25. According to plaintiffs, in *Kammeyer* genuine issues of material fact were found to be present where the personnel file of a defendant officer did not include any performance evaluations. *Id.*; *Kammeyer*, 2006 WL 1133241, at *11. Yet the absence of performance evaluations was just one of the pieces of evidence that the plaintiffs in that case highlighted; they also pointed to letters "which should have put [the city] on notice of the need to

supervise" the officer, along with an earlier report that documented "the entire command staff['s] . . . dissatisfaction with [the officer's] arrogance, failures in communication, and failures to follow through on his policing efforts." *Kammeyer*, 2006 WL 1133241, at *11. The plaintiffs in this case have not provided this kind of additional evidence.

While plaintiffs do offer Katsaris' report, his analysis focuses entirely on the facts of this particular case. As a result, the report does not provide evidence of prior instances of unconstitutional conduct that demonstrate deliberate indifference on the part of the City sufficient to defeat defendants' summary judgment motion. Moreover, plaintiffs have not shown that the City's alleged failure to train and/or to supervise was "a 'deliberate' or 'conscious' choice." Thus, plaintiffs have failed to provide enough evidence to raise a question of material fact as to this issue. Defendants are therefore entitled to summary judgment on Mays' Count II and Smith's Count VI.

For the reasons stated above,

IT IS ORDERED that defendants' motion for summary judgment is granted in part and denied in part as follows: the Court grants summary judgment on Mays' Count II and on all of Smith's claims. Defendants' motion is denied as to Mays' Count I.

|  |  |
|---|---|
| Dated: August 23, 2018<br>Detroit, Michigan | s/Bernard A. Friedman<br>BERNARD A. FRIEDMAN<br>SENIOR UNITED STATES DISTRICT JUDGE |

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on August 23, 2018.

                                                                                  s/Johnetta M. Curry-Williams
                                                                                   Case Manager